UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. 07-296 |
| Plaintiff, | |
| v. | VIOLATION: 18 U.S.C. § 371 |
| THERMO KING IRELAND LIMITED | |
| Defendant. | OCT 31 2007 |

LEON, J. RJL

### INFORMATION

The United States Department of Justice, Criminal Division, Fraud Section, charges as follows:

1. At all times material to this Information (unless specified otherwise):

GENERAL ALLEGATIONS

*Relevant Entities and Individuals*

2. THERMO KING IRELAND LIMITED ("TKI"), as of January 1, 2002 a wholly-owned subsidiary of Ingersoll-Rand Company Limited and prior to that date a wholly-owned subsidiary of Ingersoll-Rand Company (collectively, "Ingersoll"), was a global manufacturer of transport temperature control systems. TKI was headquartered in Galway, Ireland, maintained operations in a number of foreign countries, and managed its sales in the Middle East region from an office in Dubai.

3. THERMO KING CORPORATION ("Thermo King"), a wholly-owned subsidiary of Ingersoll, was a global manufacturer and supplier of transport temperature control systems.

Case Related To  CR 07-253 (RJL)

Thermo King was headquartered in Minneapolis, Minnesota. A division of Thermo King, Aftermarket Engineering ("AE"), was also headquartered in Minnesota.

4. "Employee A," an Irish citizen, was a TKI regional sales manager for the Middle East and Africa based in Dubai.

5. "Employee B," an Irish citizen, was a business development director for TKI based in Ireland. Employee B approved pricing on Iraqi spare parts contracts.

6. "Employee C," a United States citizen, was an employee of AE based in Bloomington, Minnesota.

7. "Employee D," a United States citizen, was a vice president of global sales and marketing for Thermo King, based in Minneapolis, Minnesota.

8. "Agent X," an Iraqi citizen, was TKI's sales agent and distributor in Iraq. Agent X was also the primary intermediary between TKI and the government of Iraq.

*Overview of the Kickback Scheme*

9. Between in or around October 2000 and in or around June 2002, TKI was awarded a contract valued at approximately €706,148.49 with the Government of the Republic of Iraq for the sale of spare parts for refrigerated trucks under the United Nations Oil-for-Food Program ("OFFP"). TKI secured this contract through an offer to pay a kickback of approximately €64,197.46 to the government of Iraq.

10. The kickback was authorized by Employee A and was to have been paid to the government of Iraq through Agent X. TKI concealed the kickback from the United Nations ("U.N.") by inflating its contract prices by 10% before submitting the contract for approval to the U.N.

*The United Nations Oil-for-Food Program*

11. On or around August 6, 1990, days after Iraq's invasion of Kuwait, the U.N. adopted Security Council Resolution 661, which prohibited U.N. member states from transacting business with Iraq, except for the purchase and sale of humanitarian supplies. Resolution 661 prohibited virtually all direct financial transactions with the government of Iraq.

12. On or around April 15, 1995, the U.N. adopted Security Council Resolution 986, which provided a limited exception to the Iraq sanctions regime in that it allowed Iraq to sell its oil. However, Resolution 986 required that the proceeds of oil sales be used by the Iraqi government to purchase humanitarian supplies for the Iraqi people, including food and equipment to maintain and service Iraq's oil sector. Hence, this program became known as the Oil for Food Program. Payments made to the Iraqi government which were not approved by the U.N. and which were outside the strict contours of the OFFP were prohibited.

13. The rules of the OFFP required that the proceeds of all sales of Iraqi oil be deposited into a U.N.-controlled escrow account at the New York branch of Banque Nationale de Paris ("BNP-Paribas"). That escrow account funded the purchase of humanitarian goods by the Iraqi government.

14. Under the provisions of the OFFP, a supplier of humanitarian goods contracted with a ministry or other department of the Iraqi government to sell goods to the Iraqi government. Once that contract was finalized, the contract was submitted to a U.N. Committee ("the 661 Committee"), which reviewed the contracts to ensure that their terms complied with all OFFP and Iraqi sanction regulations. The 661 Committee accepted the contracts, rejected them,

or asked the supplier to provide additional information upon which the committee could make a decision.

15. If a contract was approved by the 661 Committee, a letter of credit was issued by the New York branch of BNP-Paribas to the supplier's bank stating that the supplier would be paid by the OFFP for the relevant goods once certain conditions were met, including delivery of the goods to Iraq and inspection of the goods by a U.N. contractor. Once those conditions were deemed by the U.N. to have been met, the U.N. would direct BNP-Paribas to release payment to the supplier.

16. On or around December 10, 1996, the first Iraqi oil exports under the OFFP began. The OFFP continued from in or around December 1996 until the United States invasion of Iraq on or around March 19, 2003. From in or around December 1996 through March 2003, the United States government prohibited United States companies and individuals from engaging in transactions with the government of Iraq, unless such transactions were authorized by the U.N. pursuant to the OFFP. 31 C.F.R. § 575.201, *et seq*.

17. Beginning in approximately August 2000, the Iraqi government demanded that the suppliers of humanitarian goods pay a kickback, usually valued at 10% of the contract price, to the Iraqi government in order to be awarded a contract by the government. These kickbacks violated U.N. OFFP regulations and U.N. sanctions which prohibited payments to the Iraqi government which were not expressly approved by the U.N. and which were not contemplated by OFFP guidelines.

18. Often, these kickbacks were termed "after sales service fees" ("ASSFs"). They did not, however, involve the performance of any actual service by the supplier. Typically, these

ASSFs were included in the contract price submitted by the supplier to the U.N. without disclosing to the U.N. the fact that the contract contained an extra 10% which would be kicked back to the Iraqi government. Including the 10% in the submitted contract price allowed the supplier to avoid paying the 10% out of its profits; instead, the suppliers caused the U.N., unknowingly, to fund the kickbacks to the Iraqi government.

19. In many cases, during or after contract negotiations, the Iraqi government asked the supplier to sign an auxiliary contract, usually called a "side letter," memorializing the supplier's commitment to pay the ASSFs. These side letters usually stated explicitly that the supplier agreed to pay a set amount, approximately 10% of the contract price, to the Iraqi government in advance of the arrival of the goods in Iraq.

20. Some suppliers described the ASSFs as such in the contracts submitted to the U.N. for approval, thereby leading the U.N. to believe that actual after-sales services were being provided by the supplier. Other suppliers disguised the ASSFs by inserting fictitious line items into the contracts for good or services that were not being provided. Still other suppliers simply inflated their contract prices by 10% to account for the payments they would make, or cause to be made, to the Iraqi government.

## COUNT ONE
### (Conspiracy)

### THE CONSPIRACY AND ITS OBJECT

21. Paragraphs 1 through 20 of this Information are realleged and incorporated by reference as if set out in full.

22.  From in or around May 2000 through June 2002, within the territory of the United States and elsewhere, TKI, and others known and unknown, did unlawfully and knowingly combine, conspire, confederate, and agree together and with others to commit an offense against the United States, that is, to knowingly devise, and intend to devise, a scheme and artifice to defraud the United Nations and the Oil-for-Food Program, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, through the use of interstate and foreign wire communications, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

23.  The primary purpose of the conspiracy was to obtain and retain lucrative business with the Government of Iraq through the payment of kickbacks to the Iraqi government, which were concealed or disguised as legitimate charges.

## MANNER AND MEANS OF THE CONSPIRACY

24.  To achieve the goal of the conspiracy, TKI and others used the following manner and means, among others:

   a.  It was part of the conspiracy that TKI agreed to cause money to be sent to bank accounts controlled by the government of Iraq in exchange for being awarded a contract with that government.

   b.  It was a further part of the conspiracy that TKI submitted contracts and correspondence to the U.N. which failed to disclose and concealed the fact that the prices of the contracts had been inflated by 10% in order to generate the money that would be paid to the

6

government of Iraq and to conceal from the U.N. the fact that money would be paid to the government of Iraq.

    c.    It was a further part of the conspiracy that TKI caused the transmission of regular international wire communications between and among Thermo King offices in the United States and TKI offices in Ireland in an effort to secure approvals of the contract from the U.S. Department of State and the U.N.

## OVERT ACTS

25.    In furtherance of the conspiracy and to accomplish its unlawful object, the following overt acts, among others, were committed within the territory of the United States and elsewhere:

26.    On or around October 18, 2000, Employee A and Agent X met in Baghdad, Iraq, with officials of the Iraqi government-owned General Automobile & Machinery Trading Company ("GAMCO") to finalize a contract for the sale of spare parts for refrigerated trucks. At that meeting, GAMCO informed Employee A that GAMCO would not award the contract to TKI unless TKI agreed to pay a 10% "rebate" to the government.

27.    On or around October 19, 2000, in the presence of Agent X, Employee A signed a side letter with the Iraqi government promising that TKI would pay a kickback of approximately €64,197.46 to obtain a contract for the sale of spare parts for refrigerated trucks to GAMCO.

28.    On or around October 19, 2000, TKI signed a contract with GAMCO to supply spare parts. This contract, referenced by the U.N. as Contract 801228, with a total contract value of €706,148.49, was awarded to TKI based on an offer that included an extra 10% fee, namely the €64,197.46 kickback promised in the side letter. TKI concealed this kickback in contracts

and correspondence with the U.N. and the U.S. Department of State and intended that Agent X would use these funds to make the payment to the Iraqi government.

29. After signing Contract 801228, Employee A transmitted it via facsimile to Employee B in Ireland.

30. On or around November 14, 2000, TKI in Ireland purchased the spare parts described in Contract 801228 from Thermo King entities in the United States.

31. On or about November 27, 2000, the spare parts were shipped from the United States to Ireland.

32. In or around November 2000, Thermo King sent Contract 801228 to the legal department of Ingersoll, Thermo King and TKI's parent company, so that the legal department could obtain a license from the U.S. Treasury Department's Office of Foreign Asset Control ("OFAC"), allowing the shipment from Ireland to Iraq of the spare parts originating in the United States.

33. From in or around November 2000 through in or around December 2005, Thermo King and TKI attempted to secure approval of Contract 801228 from the United States government and the U.N.

34. On or around October 25, 2001, Thermo King's outside counsel in Washington, D.C., sent a facsimile to Employee B in Ireland which was a copy of the attorneys' letter to the U.S. Department of State, requesting assistance in securing approval of the contract by the U.N. Employee B forwarded that document to Agent X.

35. On or around April 15, 2002, Employee B sent a facsimile from Ireland to Employee C in Minnesota listing the information the U.N. needed to release a "hold" previously placed on the contract by the U.N.

36. On or around May 15, 2002, Employee B in Ireland sent an electronic mail message to Employee C in Minnesota regarding the easing of U.N. sanctions in Iraq and advising that the contract could be approved if revised and resent to the U.N. within the next seven days.

37. On or around June 17, 2002, at the behest of Agent X, Employee B in Ireland forwarded a draft letter to Employee D in Minnesota, which was addressed to the Iraqi government and explained efforts by TKI to secure approval of the contract. Later that day, Employee D responded to Employee B, approving the draft language and discussing the potential retention of a law firm to lobby OFAC to acquire the license to complete the contract.

38.  On or around February 3, 2004, AE in Minnesota sent a facsimile to TKI in Ireland which included a list of the parts sent from Thermo King in the United States to TKI in Ireland in November 2000, as well as the net invoice price of each part.

(All in violation of Title 18, United States Code, Section 371.)

STEVEN A. TYRRELL
Chief, Fraud Section

MARK F. MENDELSOHN
Deputy Chief, Fraud Section

By: *[signature]*
Kathleen M Hamann
Trial Attorney, Fraud Section


William Jacobson
Assistant Chief, Fraud Section

Criminal Division
United States Department of Justice
1400 New York Avenue, NW
Washington, D.C.  20530
(202) 305-7413